1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA SNYDER, | Case No.  1:18-cv-01495-BAM (PC) |
| Plaintiff, | ORDER DIRECTING CLERK OF COURT TO RANDOMLY ASSIGN DISTRICT JUDGE |
| v. | FINDINGS AND RECOMMENDATIONS REGARDING DISMISSAL OF ACTION |
| CARL WOFFORD, et al., | |
| Defendants. | **FOURTEEN-DAY DEADLINE** |

Plaintiff Joshua Snyder ("Plaintiff") is a former state prisoner proceeding pro se and in forma pauperis in this civil rights action under 42 U.S.C. § 1983.  Plaintiff initiated this action on August 1, 2018, and the matter was transferred to this Court on October 30, 2018.  (ECF Nos. 1 and 3.)  On May 10, 2019, the Court screened Plaintiff's first amended complaint and granted him leave to amend.  (ECF No. 12.)  Plaintiff's second amended complaint, filed on August 5, 2019, is currently before the Court for screening.  (ECF No. 20.)

I.     **Screening Requirement and Standard**

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity and/or against an officer or employee of a governmental entity.  28 U.S.C. § 1915A(a).  Plaintiff's complaint, or any portion thereof, is subject to dismissal if it is frivolous

1

1  or malicious, if it fails to state a claim upon which relief may be granted, or if it seeks monetary

2  relief from a defendant who is immune from such relief.  28 U.S.C. §§ 1915A(b).

3       A complaint must contain "a short and plain statement of the claim showing that the

4  pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  Detailed factual allegations are not

5  required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere

6  conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell

7  Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  While a plaintiff's allegations are taken

8  as true, courts "are not required to indulge unwarranted inferences."  Doe I v. Wal-Mart Stores,

9  Inc., 572 F.3d 677, 681 (9th Cir. 2009) (internal quotation marks and citation omitted).

10      To survive screening, Plaintiff's claims must be facially plausible, which requires

11  sufficient factual detail to allow the Court to reasonably infer that each named defendant is liable

12  for the misconduct alleged.  Iqbal, 556 U.S. at 678 (quotation marks omitted); Moss v. U.S.

13  Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009).  The sheer possibility that a defendant acted

14  unlawfully is not sufficient, and mere consistency with liability falls short of satisfying the

15  plausibility standard.  Iqbal, 556 U.S. at 678 (quotation marks omitted); Moss, 572 F.3d at 969.

16      **II.      Summary of Plaintiff's Allegations**

17      Plaintiff is currently housed at Immanuel House in Riverside, California.  The events in the

18  second amended complaint are alleged to have occurred while Plaintiff was housed at Wasco State

19  Prison in Wasco, California.  Plaintiff names the following defendants: (1) Warden John Katavich;

20  (2) Adam Klang, Chief Physician and Surgeon; (3) A. Youssef, Chief Medical Executive; (4) Dr.

21  M. Soleimani; (5) Dr. Harish Kumar Patel; (6) Doe 1, Building D7 Housing Officer on third watch

22  between July 31, 2014 and August 5, 2014; (7) Doe 2, Building D7 Housing Officer on third watch

23  between July 31, 2014 and August 5, 2014; (8) Doe 3, Sergeant or Lieutenant on third watch on

24  July 31, 2014; (9) Doe 4, Building D7 Housing Officer on second watch; (10) Doe 5, Building D7

25  Housing Officer on second watch; (11) Doe 6, Sergeant or Lieutenant on second watch between

26  July 31, 2014 and August 5, 2014; (12) Doe 7, Associate Warden of Housing between July 2014

27  and December 14, 2014; and (13) Doe 8, Associate Warden of Health Care Operation between July

28  2014 and December 2014.

Plaintiff's second amended complaint is lengthy, involving multiple defendants and multiple claims, spanning more than forty pages of handwritten text.  The Court has endeavored to summarize Plaintiff's claims.

Claim 1

Plaintiff alleges that on July 9, 2014, Wasco State Prison was 171.9% of designed capacity, and on August 13, 2014, the number grew to 174.2% of designed capacity.  Plaintiff alleges that these numbers demonstrated Defendant Katavich's reckless disregard for inmate health and safety.  Plaintiff also claims that as a direct and foreseeable result, he was attacked by three inmates at one time.

On July 3, 2014, Plaintiff was classified for housing in a prison dorm located on Facility D, Building 7.  The dorm holds approximately 200 inmates and was supervised by two custody officers.  On information and belief, this dorm was designed to house inmates with a classification score equaling "low risk to violence" because it was supervised by only two Wasco State Prison agents.  (ECF No. 20 at 13.)  Supervision consisted of two person teams separated by three shifts of eight hours each.  Wasco State Prison agents also acquired several hours of overtime at different locations before starting this dormitory shift, essentially causing agents to be drowsy, incoherent, and to disregard prisoners' health and safety.

Between July 3, 2014, and July 20, 2014, Plaintiff witnessed seven violent incidents in his dormitory involving a few white gang members influencing two or three separate white non-gang prisoners to violently attack unsuspecting non-gang white victims, causing significant injury to each of the seven victims on seven separate days.  Each incident required prison agents and medical agents to respond.  Plaintiff claims that notifications of increasing violence in his dormitory were ignored by each supervisory official or the Warden, subjecting Plaintiff to a substantial risk of harm to his health and safety.

On July 31, 2014, Plaintiff was informed by Defendant Soleimani that he had an infectious disease that was discovered by recent lab tests.  As a result, Defendant Soleimani prescribed Plaintiff antibiotics and issued a Comprehensive Accommodation Chrono to remove Plaintiff from the general population and to place him in a single cell for ten days to control the spread of the

infectious disease, called Vancomycin-resistant enterococcus ("VRE").  Plaintiff was directed by Defendant Soleimani to present the document to the prison agents in charge of his housing unit.

Plaintiff alleges that California Correctional Health Care Service promulgates general medical policies and some specific treatment protocols in a multi-volume Inmate Medical Service Policies and Procedures.  Plaintiff believes that these volumes include a procedure to isolate prisoners with a medical infectious disease by placing the prisoner in a single cell, protecting the infected prisoner and general population.

Plaintiff returned to D7 and presented Defendant Soleimani's medical order to the Third Watch team, Defendants Does 1 and 2, designating Plaintiff for placement in a single cell for a 10-day quarantine due to infectious disease.   Defendants Does 1 and 2 reviewed the medical chrono and then called their direct supervisor, Defendant Doe 3, to advise of the new medical order/chrono. After the call, Defendants Does 1 and 2 informed Plaintiff that there was no single cell available and he should present the order to the Second Watch team.   Defendants Does 1 and 2 directed Plaintiff back to his double bunk occupancy, knowing that Plaintiff's infectious disease could harm other prisoners.

On August 1, 2014, Plaintiff and a mandatory shadow[1] presented Defendant Soleimani's medical order to the Second Watch team, Defendants Does 4 and 5.  Defendants Does 4 and 5 called their supervisor, Defendant Doe 6.  Plaintiff again was informed that no single cell was available.

Plaintiff later returned to Defendants Does 1 and 2 when they reported for duty and requested that he be removed from the dormitory as directed by Defendant Soleimani and because of safety concerns.  Defendants Does 1 and 2 denied Plaintiff's request because the prison was full.

For five consecutive days, Plaintiff repeatedly requested from the Second and Third Watch teams that he be removed from the dormitory to a single cell pursuant to Defendant Soleimani's order and Plaintiff's increasing fear for his personal safety.  Defendants Does 1 through 6 refused

---

[1] Plaintiff asserts that "shadow" is a prison term used to describe prisoner control over another prisoner to follow and listen over a prisoner's reporting illegal activity to agents.  (ECF No. 20 at 16.)

to do anything.

On one day, after leaving the Third Watch team area, Plaintiff was attacked by three white non-gang prisoners and received serious injuries.  On August 5, 2014, a Medical Report was completed identifying that Plaintiff had abrasions/scratches on his left arm and back of the neck, active bleeding from a cut above his right eye, a bruised area at his left ear, and a reddened area on his chest and forehead.  Injuries to Plaintiff's cervical spine and lumbar spine were discovered at a later date.  At the time of the amended complaint, Plaintiff reportedly ambulated with a wheeled walker.

On August 6, 2014, Plaintiff received a Rules Violation Report ("RVR") for fighting. Plaintiff was reclassified into the Sensitive Needs Program and then found not guilty on the charge of fighting.  Plaintiff asserts that this contradicts the claim of L. Kerchner written in the RVR.

Between July 31, 2014 and August 9, 2014, Defendants Does 1 through 6 and other prison agents routinely and repeatedly interfered with and failed to carry out the treatment that Defendant Soleimani had prescribed or ordered because the prison was overcrowded.  Plaintiff alleges that the failure to follow the direct medical order for single-cell placement failed to protect Plaintiff and the general population from infectious disease and subjected Plaintiff and other prisoners and staff to a substantial risk of harm to their health and safety.  Plaintiff contends that the Warden's pervasive practice or custom to allow overcrowding deprived Plaintiff of adequate medical care.

Claim 2

In what appears to be a second claim, Plaintiff alleges that on July 3, 2014, a Wasco State Prison Receiving and Release registered nurse initiated the screening process.  Plaintiff  alerted the nurse to his medical conditions and symptoms, as follows:  (1) missed kidney surgery follow-up appointment; (2) ongoing bacterial infection; (3) kidney stent-medical device left in place after kidney surgery on May 16, 2014; (4) bleeding hemorrhoids for 12 months; (5) tumor-like growth on scalp; (6) foot issues; (7) abdominal pain, kidney pain, urinating pain, hand pain, foot pain; and (8) fever, chills and night sweats.  Plaintiff also had a list of current prescriptions, including Tramadol, Flexeril, Flow Max, a thyroid medication and an anti-inflammatory medication.

After the screening process, the nurse informed Plaintiff that medications would not be

provided until he was seen by the doctor within seven days and to pick up his medication later at pill call.  Plaintiff alleges that under the inmate medical policies and procedures, Wasco State Prison was required to honor the medication orders of the sending agency until evaluation by a primary care provider or until expiration of the medication order.  The receiving nurse also was required to verify that all medications accompanying the prisoner had current orders.  Plaintiff reports that, at the conclusion of the assessment, he was assigned Defendant Soleimani as his primary care provider.

On July 7, 2014, Plaintiff filed an emergency health care appeal complaining that he had not received any dose of Tramadol since arriving at Wasco State Prison and he was suffering intolerable pain levels and withdrawal symptoms.  Despite claims that it was an emergency, the appeal was not heard until July 16, 2014.  Plaintiff alleges that he continued to endure significant pain and suffering.

On July 15, 2014, Plaintiff was seen by a registered nurse after he submitted a Health Care Service Request form complaining of high pain levels and requesting treatment for all existing medical conditions.  The nurse informed Plaintiff that his primary care provider had a backlog of new arrivals, which accounted for the delay.  Due to the seriousness of Plaintiff's condition, the nurse scheduled Plaintiff to see the primary care physician on the following day.

On July 16, 2014, Plaintiff was seen by Defendant Soleimani who denied Plaintiff's health care appeal because Tramadol was not formulary.  Plaintiff claims that Defendant Soleimani abruptly stopped Plaintiff's pain medication despite knowing that Plaintiff had been taking 300mg every day for a twelve-month period.  Plaintiff asserts that it is generally accepted by all medical health care professionals that tapering opioid medication is done to minimize symptoms of opioid withdrawal.  During the evaluation, Plaintiff explained why his pain levels were constantly at 8 of 10, then spiking to a 10 out of 10.

Plaintiff also told Defendant Soleimani of his May 14, 2014 kidney surgery, which went unfinished because of minor complications and a stent being left in place until follow-up surgery could be completed.  Defendant Soleimani required Plaintiff to prove his claims, directing Plaintiff to pull down his pants and underwear and show the string exiting the penis, which was attached to

6

the medical device in Plaintiff's body.  Plaintiff then detailed his May 16, 2014 hospital discharge orders requiring a follow-up in two weeks so that doctors could complete Plaintiff's kidney surgery, break up kidney stones and remove the medical device.  Plaintiff then told Defendant Soleimani that on June 6, 2014, a Riverside County doctor ordered Plaintiff to be taken to a urology clinic as soon as possible because of the missed appointment follow-up surgery and fear of a bacterial infection.  Despite Plaintiff's complaints of burning pain while urinating and medical orders for kidney surgery, Defendant Soleimani told Plaintiff, "I need time to investigate the kidney stint. . . I will order an x-ray to be completed."  (ECF No. 20 at 24.)

Before ending the appointment, Plaintiff was allowed to briefly discuss his other medical complaints, including the growth on his scalp, bleeding hemorrhoids, and foot issues.  Defendant Soleimani stated that they would deal with the kidney issue first.  Plaintiff requested that Defendant Soleimani honor the Riverside County medical chrono for a bottom bunk.  Defendant Soleimani responded, "I will not give you a bottom bunk accommodation because you are too young."  (Id. at 24-25.)  When Plaintiff again requested Tramadol for pain, Defendant Soleimani stated, "I will not give it to you," and "I will be stopping the muscle spasm medication."  (Id. at 25.)  Plaintiff alleges that Defendant Soleimani was deliberately indifferent by denying pain medication and causing unreasonable delays in assessing and treating Plaintiff's kidney stones, bladder infections, abdominal pain, anxiety, bleeding hemorrhoids, scalp growth and foot issues.

On July 18, 2014, Plaintiff fell from his top bunk, striking his head and ribs, and landing on his back. Plaintiff's injuries were not apparent until a few days later when the pain became intolerable.  Plaintiff submitted at CDC 7362 on July 21, 2014, notifying medical staff of the falling incident.  Plaintiff's medical complaint and injury were triaged by a nurse on July 24, 2014, but no treatment was provided nor was a bottom bunk chrono/accommodation.

Plaintiff contends that his new arrival diagnostic was to be completed within fourteen days, but it was not completed until July 28, 2014 due to overcrowding.  The diagnostic was completed by a nurse and Joshua Garza.  Plaintiff asserts that despite his medical records and complaints, Joshua Garza generated a medical classification chrono identifying Plaintiff as a healthy man with full duty functional capacity, low medical risk and requiring only basic nursing care.

Claim 3

In an apparent third claim, Plaintiff alleges that on July 29, 2014, he awoke to an abdominal pain level of 10 out of 10.  Plaintiff recognized the pain as that associated with the passing of a kidney stone and requested medical attention.  No medical attention was provided because of a lack of medical staff.  Plaintiff contends that he was forced to endure the pain for 13 hours until he passed a kidney stone.  Plaintiff fished the stone out of the toilet so that he could show Defendant Soleimani proof of the need for surgery and adequate pain relief.

On July 30, 2014, Plaintiff was given an appointment to see Defendant Soleimani, but this appointment was cancelled because of a lack of medical staff.

On July 31, 2014, Defendant Dr. Soleimani saw Plaintiff and informed him of test results showing a serious bacterial infection, VRE, which was contagious.  Defendant Soleimani ordered (1) a single cell for 10 days; (2) antibiotics for 10 days; and (3) T-3 pain medication.  Plaintiff claims that medical staff refused to follow Defendant Soleimani's order to remove Plaintiff from the general population and place him in a single cell.  Plaintiff asserts that this caused a substantial risk to the health and safety of Plaintiff and other prisoners.

On August 1, 2014, Plaintiff was notified of pre-operation for kidney surgery.  Plaintiff also was notified that urologist, Dr. Graham, would be seeing him and conducting surgery on the following day.  Plaintiff was not seen by Dr. Graham until August 5, 2014, because of a lack of transport staff.  Dr. Graham's treatment plan was to complete the surgery as soon as possible at Tehachapi Community Hospital.  Plaintiff was informed that the surgery would be scheduled as an urgent matter or within 30 days.

After returning from his appointment with Dr. Graham, Plaintiff was attacked by other prisoners.  Because of Plaintiff's injuries and fear for his safety, Plaintiff was transferred to the Sensitive Needs Yard.  Plaintiff was evaluated by an unknown medical official, who refused to stitch close an open cut above Plaintiff's right eye.  Instead, a bandage, tape and gauze were applied.  Plaintiff claims that this negligent act caused him a noticeable scar.  He also claims that he was not provided ice packs or pain relief for the 5 large lumps he received from the attack.

On August 6, 2014, Plaintiff was escorted to another 200-person dormitory.  Plaintiff

1  informed medical and prison staff that he was a carrier of VRE and that Defendant Soleimani made

2  an order for a single cell. Plaintiff alleges that staff members ignored his claims.

3      Between August 6, 2014 and December 2014, Plaintiff was assigned a new primary care

4  provider, Dr. Harish Kumar Patel.

5      On August 6, 2014, Plaintiff was evaluated by an eye doctor relating to the injury sustained

6  in the attack.  He also was seen by a cardiologist.

7      On August 8, 2014, Plaintiff was sent to the emergency room at Bakersfield Community

8  Hospital for evaluation of a neck injury sustained in the attack.  Dr. S. Robert diagnosed and

9  documented Plaintiff's injuries with a CT Cervical Spine w/o contrast procedure.  Dr. Roberts

10  recommended pain medication and the use of a cervical collar.  Plaintiff was returned to Wasco

11  State Prison without being seen by a medical official despite Dr. Robert's order to follow up with

12  his primary care provider within 1-2 days.

13      On August 9, 2014, Plaintiff submitted a CDC 7362 alerting his primary care provider and

14  nurse that he was urinating blood, enduring serious pain levels, and having difficulty walking,

15  eating, sleeping, sitting, dressing and showering.  Plaintiff reportedly received no response from

16  medical staff.

17      On August 10, 2014, Plaintiff submitted a CDC 7362 complaining that medical staff had

18  not changed the dressing applied to the cut above his right eye or provided supplies to clean the

19  cut.

20      On August 11, 2014, Plaintiff met his new primary care provider, Dr. H. Patel.  Plaintiff

21  claims that Dr. Patel only wanted to focus on Plaintiff's recent visit to Bakersfield Community

22  Hospital.  However, Plaintiff discussed other medical complaints, including kidney surgery, kidney

23  stones, kidney stent, inability to walk, leg spasms, severe lower back nerve pain, severe neck-nerve

24  pain, bleeding and protruding hemorrhoids, growth on scalp, abdominal pains, severe bacteria

25  infection, single-cell status, and feet issues.  Plaintiff contends that Dr. Patel dismissed all of

26  Plaintiff's complaints, failed to prescribe appropriate pain medication, failed to prescribe more

27  antibiotic, failed to retest his urine for VRE, failed to single-cell Plaintiff, failed to diagnose a back

28  injury, hemorrhoids, growth on scalp, and foot issues, failed to follow-up on Dr. Graham's and Dr.

Robert's recommendations, failed to diagnose leg spasms, and failed to adhere to medical policies and procedures. Plaintiff informed Dr. Patel that he was keeping a journal. Dr. Patel reportedly responded, "Do not threaten me!" (ECF No. 20 at 29.)

Between August 12, 2014 and August 25, 2014, Plaintiff contends that Dr. Patel failed to respond to Plaintiff's numerous CDC 7362 medical requests. Plaintiff reports that these requests noted severe pain traveling from his back to left foot, severe stomach pains, severe neck pain, an inability to perform activities of daily living, inability to walk, unexplained rashes and bumps, constant leg spasms, leg numbness, fever, chills, night sweats, an inability to eat, dizziness, urinating bold and vomiting.

On August 25, 2014, Plaintiff awoke almost crying because of pain even though he had passed a kidney stone on August 23, 2014. Plaintiff could barely walk when he approached CDCR staff for medical attention. CDCR staff reportedly told him to wait for pill call because no medical staff were available at the clinic.

At pill call, Plaintiff hobbled over 80 yards to H clinic with two copies of prior submitted 7362s that went unanswered. Plaintiff was turned away by an LVN who informed Plaintiff that he would be called back after an RN showed up. No one called for him. At noon, he returned to the clinic with the same complaints. A different LVN turned him away saying they were too busy. Plaintiff asserts that he was unable to eat as a result.

On August 26, 2014, Plaintiff became feverish. He could not move, and his sheets were soaked. On August 27, 2014, Plaintiff crawled to the H clinic and then went man down after telling V. Patel about his medical complaints. V. Patel initiated CDCR emergency procedures and Plaintiff was transported to San Joaquin Community Hospital via ambulance.

Plaintiff was admitted to the hospital emergency room. He was found to have an infected left ureteral stint, positive VRE, Klebsiella, sepsis, fever, numerous kidney stones, prolapsed lumbar disk at the level of L5-S1 with left sciatica syndrome, thoracolumbar scoliosis and hypothyroidism. Plaintiff asserts that he endured weeks of antibiotic treatment and diagnostic testing. He also underwent kidney surgery to break up kidney stones and to remove the infected ureter stent. After his discharge from the hospital, Plaintiff was transported to a medical bed at

1  Pleasant Valley State Prison to continue antibiotic treatment on September 5, 2014.

2      Between September 5, 2014 and September 15, 2013, Plaintiff was forced to a single cell

3  without his legal or personal property and without the ability to write to his family.  During this

4  period, Plaintiff claims that Pleasant Valley State Prison officials punished him for invoking his

5  right to refuse antibiotic treatment by taking his pain medication away and not allowing him to

6  write to his family.  On September 8, September 10 and September 12, 2014, Plaintiff requested

7  that he be transferred back to Wasco State Prison because of mistreatment and a pending legal

8  appeal deadline.  Plaintiff allegedly was ignored.

9      On September 15, 2014, Plaintiff was transported back to Wasco State Prison.  Plaintiff's

10  discharge was reviewed, and a nurse notified Dr. H. Patel of Plaintiff's return and notified a

11  technician that a follow-up appointment was to be scheduled within five calendar days.  Plaintiff

12  claims that because of overcrowding, his follow up appointment was not conducted by Dr. H. Patel

13  until September 23, 2014.

14      On September 16, 2014, Plaintiff submitted a CDC 7362 requesting kidney stone nutrition

15  therapy.  On September 19, 2014, Plaintiff submitted CDC 7362s:  (1) to request pain medication

16  because none was being provided and Naproxen was not helping; (2) to renew antibiotic ointment

17  for foot issues; (3) to request hemorrhoid treatment; (4) to request treatment for bulging disc; (5) to

18  request kidney stone nutrition therapy; and (6) to request nutrition to regain lost weight.  Plaintiff

19  asserts that these 7362s were triaged by a nurse on September 22, 2014, and provided to H. Patel.

20  On September 23, 2014, H. Patel refused to discuss these medical complaints.

21      Plaintiff claims that because H. Patel ignored these medical complaints, Plaintiff submitted

22  five new 7362s with the same medical complaints on September 25, 2014.  He also submitted a

23  7362 requesting a follow-up with a specialist regarding a bulging disc and spine issues and alerting

24  a technician that no doctor had followed up on the spine issues after they were diagnosed at San

25  Joaquin County Hospital on August 27, 2014.

26      Plaintiff additionally generated a CDCR 22 addressed to Wasco State Prison's Chief

27  Medical Officer.  Plaintiff requested intervention in H. Patel's acts or omissions.  Plaintiff did not

28  receive a response.

On October 3, 2014, Plaintiff generated a CDCR 22 addressed to Adam Klang.  Plaintiff requested intervention in the acts or omissions by Dr. H. Patel.  Adam Klang failed to respond.

Plaintiff continued to advocate for his health and safety, submitting numerous CDC 7362s and health care appeals.  Dr. H. Patel failed to respond to Plaintiff's medical requesting, including continuation of antibiotic treatment for contagious bacteria infecting, a kidney stent, painful growth on the scalp, protruding and bleeding hemorrhoids, foot issues and other medical complaints.

Plaintiff alleges that Dr. H. Patel's failure to continue antibiotic treatment caused the bacterial infection to grow and spread into Plaintiff's blood stream.  Plaintiff's body allegedly began to shut down, requiring him to be hospitalized.  Plaintiff underwent extensive treatment to save his life.

Plaintiff further alleges that Dr. H. Patel failed to treat Plaintiff's kidney stent by not acknowledging prior medical orders or Dr. Graham's recommendations.  Plaintiff asserts that this caused him to undergo emergency surgery while hospitalized at San Joaquin Community Hospital for antibiotic treatment.  Plaintiff claims that kidney surgery was performed on the hospital's diagnosis, not because Dr. H. Patel's specialty referral.  Plaintiff contends that Dr. H. Patel failed to provide adequate health care for Plaintiff's kidney issues.

Additionally, Plaintiff contends that Dr. H. Patel continued to ignore Plaintiff's request for treatment of the growth on his scalp, hemorrhoids and foot issues.  Dr. H. Patel reportedly stated that they were not serious medical issues.  However, Plaintiff asserts that these omissions caused these conditions to worsen and the unnecessary and wanton infliction of pain.

Plaintiff asserts that Dr. H. Patel failed to acknowledge Plaintiff's back injuries and did not initiate a treatment plan for Plaintiff's neck injury resulting from the assault on August 5, 2014. Plaintiff submitted numerous CDC 7362s on these issues, which Dr. H. Patel ignored to the extent that Plaintiff was denied proper care and treatment, including sufficient pain medication.

Plaintiff claims that only doctors at San Joaquin County Hospital acknowledged his spine complaints.  A CT scan revealed a protruding and/or broad-based disc bulging at the L5-S1.  Even when these findings were presented to Dr. H. Patel on or around September 15, 2014, he allegedly failed to acknowledge them.  Plaintiff contends that Dr. H. Patel's failure to treat his spine injury

1   resulted in further significant injury and pain.  By November 2014, Plaintiff claims that he was

2   forced to use a wheelchair for mobility.  Plaintiff asserts, among other things, that Dr. H. Patel

3   cannot blame overcrowding at Wasco State Prison as the reasons for failing to provide

4   unconstitutional healthcare.

5       In addition to the foregoing, Plaintiff alleges that Dr. A. Klang reviewed the majority of

6   Plaintiff's grievances without conducting a face-to-face interview and relied instead on a third-

7   party assessment to deny Plaintiff's complaints.  Dr. Klang interviewed Plaintiff regarding acts

8   and/or omissions by Dr. H. Patel on October 23, 2014 and October 8, 2014.  During the interview,

9   Plaintiff informed Dr. Klang of all medical conditions that were not being treated by Dr. H. Patel.

10  Plaintiff also reported that each time he requested that Dr. H. Patel treat him, Dr. H. Patel would

11  get angry, threaten him and make false statements.  Plaintiff contends that Dr. Klang had the

12  authority to intervene and a duty to order proper medical care.

13      Plaintiff, who was dissatisfied with Dr. Klang's response to every medical appeal, went to

14  the Second Level of the appeal process.  At the Second Level, Dr. A. Youssef reviewed almost all

15  of Plaintiff's appeals that were denied by Dr. Klang.  Plaintiff claims that Dr. Youssef essentially

16  rubberstamped Dr. Klang's decision to deny every medical appeal.  Plaintiff further claims that Dr.

17  Youssef had the authority to reevaluate Dr. Klang's decisions and to intervene but failed to ensure

18  that proper medical care was being provided to Plaintiff.

19      Plaintiff alleges that Drs. Klang and Youssef failed to adequately supervise and train staff.

20  Plaintiff also alleges that these doctors knew that overcrowding at Wasco State Prion was adversely

21  impacting the medical system and the system was failing to ensure timely care and treatment.

22      Plaintiff asserts that Defendant Katavich failed to adequately supervise and train Does 7

23  and 8 and failed to put into place procedures so that Does 3 and 6 could carry out treatment

24  prescribed by Defendant Soleimani to isolate prisoners known to have infections.  Plaintiff further

25  asserts that Defendant Katavich knew that overcrowding was adversely affecting operating

26  procedures to ensure that prisoners were being housed appropriately and that this failure was

27  injuring prisoners.

28      Plaintiff alleges that Does 3 and 6 failed to adequately supervise and train Does 1, 2, 4 and

1   5 and put into place procedures so that Plaintiff could be removed from the general population after

2   he voiced his fear for his safety.   Plaintiff claims that Defendants Does 3 and 4 knew that

3   overcrowding adversely affected the ability to move prisoners for safety and this failure resulted in

4   injuries to prisoners.  Plaintiff contends that the need for more or different training was obvious,

5   such that supervisors like the Warden and Does 8, 7, 6 and 3 were deliberately indifferent to

6   Plaintiff's need for safety and adequate medical care.

7        Causes of Action

8        In his first cause of action, Plaintiff contends that Defendants Katavich, Klang, Youssef,

9   Soleimani, H. Patel and Does 1-8 were deliberately indifferent to his needs in violation of the Eighth

10  Amendment by refusing to single cell him and/or their failure to provide timely and appropriate

11  treatment and specialist referral because of overcrowding.

12       In his third cause of action, Plaintiff contends that Defendants Katavich, Klang, Youssef,

13  and Does, 8, 7, 6 and 3 were deliberately indifferent to his needs in violation of the Eighth

14  Amendment.  Their violations resulted from their alleged failure to properly supervise and train

15  subordinates and their acts were in conscious disregard of Plaintiff's rights.

16       In his fourth cause of action, Plaintiff contends that Defendants Katavich, Klang, Youssef,

17  Soleimani, H. Patel and Does 1-8 acts were negligent.

18       In his fifth cause of action, Plaintiff contends that Defendants Katavich, Klang, Youssef,

19  and Does 8, 7, 6 and 3 were negligent in their duty to properly supervise and train subordinates.

20       Relief

21       As relief, Plaintiff seeks an injunction against Defendant Klan, Youssef and Katavich.  He

22  also seeks compensatory and punitive damages.

23  **III.   Discussion**

24  **A.   Federal Rule of Civil Procedure 18 and 20**

25       As Plaintiff was previously informed, he may not bring unrelated claims against unrelated

26  parties in a single action. Fed. R. Civ. P. 18(a), 20(a)(2); Owens v. Hinsley, 635 F.3d 950, 952 (7th

27  Cir. 2011); George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007). Plaintiff may bring a claim against

28  multiple defendants so long as (1) the claim arises out of the same transaction or occurrence, or

14

1   series of transactions and occurrences, and (2) there are commons questions of law or fact. Fed. R.

2   Civ. P. 20(a)(2); Coughlin v. Rogers, 130 F.3d 1348, 1351 (9th Cir. 1997). The "same transaction"

3   requirement refers to similarity in the factual background of a claim. Id. at 1349. Only if the

4   defendants are properly joined under Rule 20(a) will the Court review the other claims to determine

5   if they may be joined under Rule 18(a), which permits the joinder of multiple claims against the

6   same party.

7        Plaintiff's amended complaint improperly asserts different claims against different

8   defendants in a single action. For instance, Plaintiff improperly forwards a claim against doe

9   defendant custody officers in one housing facility for failure to protect him from harm while

10   simultaneously pursuing an unrelated claim against Defendant H. Patel, in a different housing

11   facility, for deliberate indifference to serious medical needs.  Despite being informed of this

12   pleading deficiency, Plaintiff has failed to correct it and has continued to pursue unrelated claims

13   in this action.  The Court nonetheless will screen Plaintiff's apparent claims to ascertain whether

14   he states any cognizable claims for relief.

15        **C.**      **Eighth Amendment – Failure to Protect**

16        Plaintiff appears to complain that Does 1 through 6 failed to protect him from an assault at

17   the hands of another prisoner.  Prison officials have a duty under the Eighth Amendment to protect

18   prisoners from violence at the hands of other prisoners because being violently assaulted in prison

19   is simply not part of the penalty that criminal offenders pay for their offenses against society.

20   Farmer, 511 U.S. at 833−34 (quotation marks omitted); Clem v. Lomeli, 566 F.3d 1177, 1181 (9th

21   Cir. 2009); Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005). Prison officials are liable under

22   the Eighth Amendment only if they demonstrate deliberate indifference to conditions posing a

23   substantial risk of serious harm to an inmate; and it is well settled that deliberate indifference occurs

24   when an official acted or failed to act despite his knowledge of a substantial risk of serious harm.

25   Farmer, 511 U.S. at 834, 841 (quotations omitted); Clem, 566 F.3d at 1181; Hearns, 413 F.3d at

26   1040.

27        Plaintiff fails to adequately allege that any of the doe defendants knew that Plaintiff was at

28   risk of attack.  Although Plaintiff complains of overcrowding and his reported need for single cell

status, there is no indication that the doe defendants were aware of any specific risk of an assault on Plaintiff, or that they were aware of conditions posing a specific risk of harm to Plaintiff.  To the extent Plaintiff expressed generalized fears for his safety, there are no allegations suggesting that Plaintiff clearly and directly informed any of the doe defendants that he was at a particular risk of attack or even that he feared being physically attacked.  Rather, Plaintiff's complaints were generalized and related primarily to his purported medical needs.  Plaintiff's conclusory or generalized allegations are not sufficient to state a claim.  Plaintiff has been unable to cure the deficiencies in this claim.

**D.      Eighth Amendment – Deliberate Indifference to Medical Needs**

A prisoner's claim of inadequate medical care does not constitute cruel and unusual punishment in violation of the Eighth Amendment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The two-part test for deliberate indifference requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096.

A defendant does not act in a deliberately indifferent manner unless the defendant "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "Deliberate indifference is a high legal standard," Simmons v. Navajo Cty. Ariz., 609 F.3d 1011, 1019 (9th Cir. 2010); Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm. Jett, 439 F.3d at 1096.

In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Labs., 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105–06). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition

1   does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical

2   malpractice does not become a constitutional violation merely because the victim is a prisoner."

3   Estelle, 429 U.S. at 106; see also Anderson v. Cty. of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995).

4   Even gross negligence is insufficient to establish deliberate indifference to serious medical needs.

5   See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

6          Further, a "difference of opinion between a physician and the prisoner—or between medical

7   professionals—concerning what medical care is appropriate does not amount to deliberate

8   indifference." Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012) (citing Sanchez v. Vild, 891

9   F.2d 240, 242 (9th Cir. 1989)), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d

10  1076, 1082–83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122–23 (9th Cir. 2012) (citing

11  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, Plaintiff "must show that the course

12  of treatment the doctors chose was medically unacceptable under the circumstances and that the

13  defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow, 681

14  F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).

15         Does 1 through 6

16         Plaintiff appears to claim that Does 1-6 were deliberately indifferent to his medical need for

17  a single cell due to the contagious nature of his bacterial infection.  Plaintiff's allegations are not

18  sufficient to state a cognizable claim.  At a basic level, the single cell placement recommended by

19  Dr. Soleimani was to prevent the spread and transmission of a contagious infection to other

20  prisoners.  Plaintiff cannot forward a claim based on the health and safety of other prisoners.

21         Insofar as Plaintiff complains about his placement, a prisoner does not have a constitutional

22  right to be housed in a single cell. See Rhodes v. Chapman, 452 U.S. 337, 347-48 (1981) (holding

23  that double-celling does not violate Eighth Amendment when it does not involve conditions

24  amounting to unnecessary and wanton pain). An inmate has no constitutional right to a particular

25  security classification or housing. See Meachum v. Fano, 427 U.S. 215, 224–25 (1976) (no liberty

26  interest protected by the Due Process Clause is implicated in a prison's reclassification and transfer

27  decisions); see also Myron v. Terhune, 476 F.3d 716, 718 (9th Cir. 2007). Neither the Eighth nor

28  the Fourteenth Amendment endows prisoners with a right to be housed in a particular part of the

1    prison or with a particular inmate.  See Meachum, 427 U.S. at 224–25 (no liberty interest in

2    placement in particular facility); Allen v. Purkett, 5 F.3d 1151, 1153 (8th Cir.1993) (no Due Process

3    right to be housed in a certain barrack or housing unit or with certain inmates); Bjorlin v. Hubbard,

4    No. CIV S–09–1793, 2010 WL 457685, *1 (E.D. Cal. Feb. 4, 2010) (same).  The deficiencies in

5    this claim cannot be cured by amendment.

6          Dr. Soleimani

7          Plaintiff appears to claim that Defendant Soleimani was deliberately indifferent by denying

8    pain medication and causing unreasonable delays in assessing and treating Plaintiff's kidney stones,

9    bladder infections, abdominal pain, anxiety, bleeding hemorrhoids, scalp growth and foot issues.

10   He also claims that Dr. Soleimani was deliberately indifferent by failing to assign him to a lower

11   bunk.

12         As to Plaintiff's complaint that Dr. Soleimani discontinued Plaintiff's pain medication,

13   Plaintiff fails to state a cognizable claim for deliberate indifference to serious medical needs.

14   According to Plaintiff's allegations, Dr. Soleimani determined on July 16, 2014, that Plaintiff's

15   medication should be discontinued as non-formulary, and as early as July 31, 2014, Plaintiff was

16   prescribed T-3 for pain.  There is no indication that Plaintiff was denied all treatment for pain.  At

17   best, Plaintiff's allegations evidence a disagreement regarding the type of treatment he received for

18   pain.  However, any such disagreement with the course of treatment will not support an Eighth

19   Amendment claim.  See Snow, 681 F.3d at 987 (finding difference of opinion between a physician

20   and prisoner concerning what medical care is appropriate does not amount to deliberate

21   indifference); Estelle, 429 U.S. at 106 (finding that a complaint that a physician has been negligent

22   in treating a medical condition does not state a valid claim of medical mistreatment under the Eighth

23   Amendment).

24         As to any complaint that Dr. Soleimani was deliberately indifferent to his bacterial

25   infection, Plaintiff's allegations also are not sufficient to state a claim.  According to the allegations,

26   Dr Soleimani prescribed an antibiotic and pain medication in response to Plaintiff's diagnosed

27   bacterial infection.  Any disagreement with the course of treatment does not support an Eighth

28   Amendment claim.  Snow, 681 F.3d at 987; Estelle, 429 U.S. at 106.

As to Plaintiff's allegations based on Dr. Soleimani's alleged failure to address Plaintiff's kidney condition, Plaintiff's amended complaint fails to state a cognizable claim.  Plaintiff's allegations indicate that when he first saw Dr. Soleimani on July 16, 2014, Dr. Soleimani prioritized Plaintiff's treatment for his kidney stones and stent.  Dr. Soleimani ordered an x-ray and Plaintiff subsequently was scheduled for surgery.  On August 1, 2014, Plaintiff was notified of pre-operation for kidney surgery on August 2, 2014.  Plaintiff saw the urologist on August 5, 2014.  Plaintiff subsequently was transferred from Dr. Soleimani's care on or about August 5, 2014.  There is nothing in Plaintiff's amended complaint to suggest that Dr. Soleimani's order of an x-ray and the subsequent referral for surgery and a urology specialist amounted to deliberate indifference to a serious medical need.  Indeed, there is nothing to suggest that Dr. Soleimani failed to act or to respond to Plaintiff's pain or possible medical need. Jett, 439 F.3d at 1096.

As to Plaintiff's allegations that Dr. Soleimani failed to treat his anxiety, bleeding hemorrhoids, scalp growth and foot issues, such allegations fail to state a cognizable claim for deliberate indifference to a serious medical need.  First, Plaintiff's own allegations demonstrate that on July 16, 2014, Dr. Soleimani elected to prioritize Plaintiff's kidney issues, suggesting that Plaintiff's remaining complaints did not involve a serious medical need.  Second, Plaintiff's allegations do not indicate that he suffered any harm from Dr. Soleimani's decision to prioritize his kidney issues over those associated with his anxiety, hemorrhoids, scalp growth and unspecified foot issues.  Jett, 439 F.3d at 1096 (stating a claim for deliberate indifference requires a plaintiff to show a serious medical need, the response to that need was deliberately indifferent and the indifference caused harm).

As to Plaintiff's allegations that Dr. Soleimani refused to provide him with a lower bunk chrono, Plaintiff's allegations also fail to state a cognizable claim.  Although Plaintiff fell from the top bunk, there is no indication that his medical condition required a lower bunk placement, and at least one other medical provider determined contemporaneously that Plaintiff did not have functional limitations.  Plaintiff's allegations therefore demonstrate, at most, a difference of opinion between Plaintiff and Dr. Soleimani concerning the need for a lower bunk chrono.  A difference of opinion does not amount to deliberate indifference.  Snow, 681 F.3d at 987.

Dr. Patel

Plaintiff's second amended complaint contains allegations that Dr. Patel was deliberately indifferent to his medical needs on multiple occasions over a period of time between August and October 2014. Plaintiff's allegations fail to state a cognizable claim for relief. At best, Plaintiff's claims amount to negligence or gross negligence, which will not support an Eighth Amendment complaint.

Specifically, Plaintiff generally alleges that he submitted a CDC 7362 on August 9, 2014, alerting his primary care provider and nurse that he was urinating blood, enduring serious pain levels, and having difficulty walking, eating, sleeping, sitting, dressing and showering. There is no indication that Plaintiff submitted this CDC 7362 to Dr. Patel or that Dr. Patel knew of Plaintiff's complaints and failed to respond. Plaintiff received follow-up treatment with Dr. Patel on August 11, 2014, only two days after Plaintiff's alleged submission of the CDC 7362.

Plaintiff also alleges that on August 11, 2014, Dr. Patel failed to consider Plaintiff's myriad medical complaints by failing to prescribe appropriate pain medication and more antibiotics, failing to retest his urine for VRE, and failing to diagnose a back injury, hemorrhoids, growth on scalp, foot issues and leg spasms. Plaintiff also claims that Dr. Patel failed to follow the recommendations of Dr. Graham and Dr. Roberts. Plaintiff's allegations related to medications and testing amount to a difference of opinion regarding treatment, which will not support an Eighth Amendment claim. Likewise, Plaintiff's allegations concerning any failure to diagnose or properly treat a condition amount to negligence or gross negligence, which will not support an Eighth Amendment claim. As to the specific recommendations regarding Plaintiff's kidney issues, including the stent and infection, Plaintiff had been seen by Dr. Graham only a few days before, on August 5, 2014, and was to be scheduled for surgery within thirty (30) days. Given the recent referral and treatment plan, there is no indication that Dr. Patel was deliberately indifferent to Plaintiff's need for surgery or the treatment of his kidney condition. Plaintiff's surgery ultimately took place within the thirty day window of planned treatment.

Plaintiff further contends that Dr. Patel failed to respond to Plaintiff's numerous CDC 7362 medical requests between August 12, 2014 and August 25, 2014. However, there is no indication

20

1    that these medical requests were directed to Dr. Patel in the first instance or that Dr. Patel received

2    these requests and failed to respond to any medical need.  Insofar as Plaintiff faults medical staff

3    for failing to call him for treatment on August 25, 2014, there is nothing in Plaintiff's complaint to

4    suggest that Dr. Patel was in any way involved.

5           Plaintiff's amended complaint also includes allegations involving Dr. Patel after Plaintiff's

6    hospitalization on August 26, 2014, and his subsequent placement and return from Pleasant Valley

7    State Prison on September 15, 2014.  According to Plaintiff, on September 23, 2014, H. Patel

8    refused to discuss Plaintiff's request for pain medication, antibiotic ointment for foot issues,

9    hemorrhoid treatment, and bulging disc treatment.  Dr. Patel also reportedly refused to discuss

10   Plaintiff's request for kidney stone nutrition therapy and nutrition to regain lost weight.  To the

11   extent that Plaintiff disagrees with Dr. Patel's decision not to prescribe certain medications or

12   treatment, such a disagreement does not support an Eighth Amendment claim.  Dr. Patel's alleged

13   negligence or even gross negligence in his diagnoses or treatment of Plaintiff's medical conditions

14   also will not support a claim for deliberate indifference to a serious medical need.  Moreover, as

15   suggested by Plaintiff's allegations concerning his grievances, Dr. Patel reportedly did not find that

16   Plaintiff had serious medical needs.  Insofar as Plaintiff submitted additional CDC 7362 requests

17   after this appointment, there is no indication that Dr. H. Patel received these requests or knew of

18   these requests and failed to respond to a serious medical need.

19           Defendants Klang and Youssef

20           Plaintiff primarily complains of the review of his medical grievances by Defendants Klang

21   and Youssef.  Prisoners do not have an independent constitutional due process entitlement to a

22   specific administrative grievance procedure. Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003);

23   Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988) (holding that there is no protected liberty interest

24   to a grievance procedure). The prison grievance procedure does not confer any substantive rights

25   upon inmates and actions in reviewing appeals cannot serve as a basis for liability under section

26   1983. Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir.1993); see also Wright v. Shannon, No. 1:05-

27   cv-01485-LJO-YNP PC, 2010 WL 445203, at *5 (E.D. Cal. Feb. 2, 2010) (plaintiff's allegations

28   that prison officials denied or ignored his inmate appeals failed to state a cognizable claim under

the First Amendment). Denial or refusal to process a prison grievance is not a constitutional violation. <u>Rushdan v. Gear</u>, No. 1:16-cv-01017-BAM (PC), 2018 WL 2229259, at *6 (E.D. Cal. May 16, 2018). Plaintiff's amended complaint fails to state a claim based solely on the review, processing and/or denial of his grievances. The deficiencies in this claim cannot be cured by amendment.

### F.    Supervisory Liability

Plaintiff is attempting to impose liability against Defendants Katavich, Klang, Youssef, and multiple doe defendants based on their roles as supervisors, which he may not do. Liability may not be imposed on supervisory personnel for the actions or omissions of their subordinates under the theory of respondeat superior. <u>Iqbal</u>, 556 U.S. at 676−77; <u>Simmons v. Navajo Cty., Ariz.</u>, 609 F.3d 1011, 1020−21 (9th Cir. 2010); <u>Ewing v. Cty. of Stockton</u>, 588 F.3d 1218, 1235 (9th Cir. 2009); <u>Jones v. Williams</u>, 297 F.3d 930, 934 (9th Cir. 2002). Supervisors may be held liable only if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them." <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989); <u>accord</u> <u>Starr v. Baca</u>, 652 F.3d 1202, 1205−06 (9th Cir. 2011); <u>Corales v. Bennett</u>, 567 F.3d 554, 570 (9th Cir. 2009). Supervisory liability may also exist without any personal participation if the official implemented "a policy so deficient that the policy itself is a repudiation of the constitutional rights and is the moving force of the constitutional violation." <u>Redman v. Cty. of San Diego</u>, 942 F.2d 1435, 1446 (9th Cir. 1991) (citations and quotations marks omitted), abrogated on other grounds by <u>Farmer v. Brennan</u>, 511 U.S. 825 (1970).

As discussed above, Plaintiff has not stated claims for a violation of his constitutional rights. Accordingly, Plaintiff cannot attempt to impose supervisory liability in the absence of such violations. Moreover, Plaintiff fails to adequately allege that Defendants Katavich, Klang, Youssef or the doe defendants participated in or directed any violation of Plaintiff's constitutional rights. As to policy implementation, although Plaintiff suggests that his assault and the denial of medical treatment resulted from policy decisions to allow overcrowding in the prison, there is nothing to indicate that overcrowding led to Plaintiff's attack or that overcrowding resulted in significant delays in his medical treatment.

**F.    State Law Claims**

Plaintiff purports to bring state law claims for negligence and negligent failure to supervise and train.  The Government Claims Act requires exhaustion of Plaintiff's state law tort claims with the California Victim Compensation and Government Claims Board, and Plaintiff is required to specifically allege compliance in his complaint. Shirk v. Vista Unified Sch. Dist., 42 Cal. 4th 201, 208–09 (Cal. 2007); State v. Superior Court of Kings Cty. (Bodde), 32 Cal. 4th 1234, 1239 (Cal. 2004); Mabe v. San Bernardino Cty. Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1111 (9th Cir. 2001); Mangold v. California Pub. Utils. Comm'n, 67 F.3d 1470, 1477 (9th Cir. 1995); Karim– Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 627 (9th Cir. 1988). Plaintiff has failed to allege compliance with the Government Claims Act.  According to the complaint, Plaintiff presented late claims.  His applications to present a late claim and the claim itself were rejected.  (ECF No. 20 at 6, 71, 74, 82.)  Plaintiff has not obtained relief from Kern County Superior Court to submit a late claim.  (Id. at 6.)

**F.    Injunctive Relief**

Insofar as Plaintiff seeks injunctive relief against prison officials at Wasco State Prison, any such request is now moot because Plaintiff is no longer housed at that facility.  See Andrews v. Cervantes, 493 F.3d 1047, 1053 n.5 (9th Cir. 2007) (prisoner's claims for injunctive relief generally become moot upon transfer) (citing Johnson v. Moore, 948 F.2d 517, 519 (9th Cir. 1991) (per curiam) (holding claims for injunctive relief "relating to [a prison's] policies are moot" when the prisoner has been moved and "he has demonstrated no reasonable expectation of returning to [the prison]")).

**IV.    Conclusion and Recommendation**

Plaintiff's second amended complaint fails to state a cognizable claim for relief.  Despite being provided with relevant pleading and legal standards, Plaintiff has been unable to cure the deficiencies in his complaint by amendment, and thus further leave to amend is not warranted. Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000).

Accordingly, the Court HEREBY DIRECTS the Clerk of the Court to randomly assign a district judge to this action.

1        Further, for the reasons stated above, IT IS HEREBY RECOMMENDED that this action

2   be dismissed based on Plaintiff's failure to state a cognizable claim upon which relief may be

3   granted.

4        These Findings and Recommendation will be submitted to the United States District Judge

5   assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **fourteen (14)**

6   **days** after being served with these Findings and Recommendation, Plaintiff may file written

7   objections with the Court. The document should be captioned "Objections to Magistrate Judge's

8   Findings and Recommendation." Plaintiff is advised that failure to file objections within the

9   specified time may result in the waiver of the "right to challenge the magistrate's factual findings"

10  on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923

11  F.2d 1391, 1394 (9th Cir. 1991)).

12

13  IT IS SO ORDERED.

14  Dated:   **August 24, 2020**                    /s/ *Barbara A. McAuliffe*

15                              UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28